**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**


**CIVIL ACTION NO. 2:17-cv-68 (WOB-CJS)**


**ADAM RAY**                                                  **PLAINTIFF**

**VS.**              <u>**MEMORANDUM OPINION AND ORDER**</u>

**AT&T MOBILITY LLC, ET AL.**                          **DEFENDANTS**


This matter is before the Court on Defendants' motion in limine to exclude Scott R. Bauries, J.D., Ph.D, (Doc. 74); Defendants' motion for summary judgment, (Doc. 75); Defendants' motion to strike one of Plaintiff's exhibits (Doc. 86), *cf.* (Doc. 77-53); and Defendants' motion to supplement Defendants' motion in limine. (Doc. 85).

The Court previously heard oral argument on these motions and took them under submission pending the parties' efforts to mediate this matter. (Doc. 89). The parties have notified the Court that those efforts were unsuccessful. (Doc. 99).

The Court now issues the following Memorandum Opinion and Order.

## *Factual and Procedural Background*

Plaintiff Adam Ray was hired by Defendant AT&T Mobility, LLC ("AT&T") on January 2, 2014, as a part-time retail sales consultant at one of AT&T's Kentucky stores. (Doc. 1-2, ¶¶ 2-6); (Doc. 75-2, ¶¶ 7-9). Part-time employees are scheduled to work "up to 28 hours per week." (Doc. 75-2, ¶ 11).

In March 2014, Ray transferred to AT&T's Maysville, Kentucky store. At all relevant times, Defendant Amy Waymire was the Area Sales Manager for this store location. (Doc. 75-3, ¶¶ 2-5); (Doc. 1-2, ¶ 5). Based upon the needs of the store, an automated scheduling system ("People Tool") generated employees' schedules, and in Ray's case, his permanent schedule was 32 hours each week until May 2015. (Doc. 75-2, ¶¶ 11-13; Doc. 75-7, Pl.'s Dep. at 83. At an end-of-the-year party in December 2014, Ray asked Waymire about transferring again to another part-time position at the Richmond, Kentucky store. According to Ray, Waymire responded "that it wasn't a problem, as soon as [Ray] needed to make that

happen, contact her directly and she would make it happen." (Doc. 75-7 at 226).

## A. AT&T's Policy for Requesting FLMA Leave

AT&T's FMLA policy prescribes the steps that an employee must take to request FMLA leave. (Doc. 75-4, ¶ 8; *id.* Ex. A). That policy is located on AT&T's intranet site and is available to all AT&T employees. An employee's FMLA entitlement for the year is posted on the same webpage used to access and view payroll information and leave balances for the year. *Id.* at ¶ 13. If an employee has difficulty determining their FMLA eligibility and entitlement, they can receive assistance from a Human Resources (HR) representative via a "Chat Now" icon or "Contact Us" link on the home page. *Id.* at ¶¶ 10-11. AT&T's FMLA operations team has no record of Plaintiff ever contacting the department to determine his FMLA entitlement. *Id.* at ¶ 12.

To request FMLA leave or report an absence as FMLA leave, an employee must follow three steps: (1) contact the Mobility Centralized Payroll Change Administration

("MCPCA") and report the FMLA request; (2) verify the details of the request in the FMLA 1 form, including the date of the absence and the reason for taking leave; and (3) provide a supporting certification from a health care provider (FMLA 4) to AT&T's FMLA operations by the designated due date. (Doc. 75-4, Ex. A). The MCPCA staff then submits the employee's request to AT&T's FMLA operations department. (Doc. 75-4, ¶ 16). The FMLA operations team reviews the certification from the employee's health care provider and issues a Form FMLA 5, notifying the employee whether their FMLA leave request was approved, pending because a health certification was needed, or denied and the reason for the denial. *Id.* at ¶¶ 17, 22.

An employee can opt to have FMLA notifications sent to two (2) email addresses. *Id.* at ¶ 23; *id.* Ex. C. The employee can also monitor the status of FMLA requests from work or home by accessing the AT&T intranet website or contacting HR/FMLA operations at the telephone number provided on any FMLA 1, FMLA 4, or FMLA 5 form. *Id.* at ¶

23.

## B. Ray's FMLA Leave History at AT&T

As a part-time employee working a permanent work schedule of 32 hours per week, AT&T calculated that Ray's FMLA entitlement for 12 weeks of work was 384 hours. (Doc. 75-4, ¶ 25); (Doc. 75-9, Pl.'s Dep. at 83). On January 20, 2015, Ray was notified on an FMLA 1 form that he was entitled to 384 hours of FMLA leave for 2015. (Doc. 75-4, ¶ 26; *id.* Ex. B).

Due to a back injury and anxiety, Ray requested through the MCPCA and was approved for intermittent FMLA leave on various dates from March 8, 2015 through May 23, 2015. (Doc. 75-4, ¶ 31(a)-(r); *id.* Ex. C). Ray used 125 hours of FMLA leave during this period. *Id.* at ¶ 27.

At the end of May 2015, Ray's permanent work schedule changed from 32 hours per week to 27.25 hours per week. (Doc. 75-4, ¶ 29; Doc. 75-2, ¶ 17). This new schedule was automatically generated by the People Tool scheduling system based upon the needs of the store. (Doc. 75-2, ¶¶ 12, 17). As a result, AT&T calculated that Ray's FMLA

entitlement was 220.73 hours for the remainder of 2015. (Doc. 75-4 at ¶ 29).

In a message sent on June 10, 2015, Ray followed up with Waymire regarding the previously discussed possibility of transferring to the Richmond location. (Doc. 77-14). Waymire responded the next day that "The company changed the headcount for that store" and they did not "not have any part time openings in Richmond." *Id.*; (Doc. 75-3, ¶ 11). The Retail Sales Manager for the Richmond store, Jessica Webb, confirmed that there were not "any open part time positions in June 2015 as a result of a change in headcount." (Doc. 75-5, ¶¶ 4-5).

Ray again was approved for and took intermittent FMLA leave on various dates from June 6, 2015 through October 4, 2015. (Doc. 75-4, ¶ 31(r)-(zz); *id.* Ex. C); (*see* Doc. 1-2, ¶ 9). The specified reason for Ray taking FMLA leave on these dates was either his back injury, anxiety, or some other "unknown" reason. (Doc. 75-4, ¶ 31). During this period Ray exhausted 237.72 hours of FMLA leave. (*see* Doc. 75-4, ¶ 31(r)-(zz)). Ray was notified on

October 27, 2015 that his request to use FMLA leave for hours he was absent on October 5, 2015 and October 6-9, 2015 was not approved because he had exhausted his 12-week entitlement to intermittent FMLA leave. (Doc. 75-4, ¶ 32; *id.* Ex. D).

### C. Anticipated Disability Leave & Short-Term Disability Benefits

Although Ray had exhausted his FMLA leave for 2015, he was granted an anticipated disability leave ("ADL") for October 10, 2015 through October 26, 2015. (Doc. 75-2, ¶ 24). An ADL is a discretionary departmental leave that may be granted when the employee has no other leave available. AT&T excuses the employee's absences so that they can apply for short-term disability ("STD") benefits or seek a job accommodation. (*Id.* at ¶¶ 25-27). Ray, however, did not apply for short-term disability benefits until the "end of October," specifically, October 27, 2015—*after* Ray's ADL had ended. (Doc. 75-2, ¶ 28); (Doc. 75-9, Pl.'s Suppl. Resp. to Interrog. at 4).

On November 19, 2015, the store manager, Fred Hoskins, sent Ray a text message, stating "I called Short

term today and they said they haven't received the proper medical documentation. They need for you to call them." Ray replied, "Thanks. I'll give them a call." (Doc. 77-24 at 2).

On November 24, 2015, Ray received a letter notifying him that his application for short-term disability benefits was denied because "[s]ubmission of medical information was due on 11/12/2015" and "records indicate that you have not provided medical records . . . as we requested when you reported your STD claim." (Doc. 75-7, Ex. 65). Ray did not appeal this decision until April 2016, several months after his employment was terminated. (Doc. 75-2, ¶ 60).

### D.  Unemployment Benefits Claims

Before beginning his ADL on October 10, 2015, Ray applied for unemployment benefits with the Kentucky Division of Unemployment Insurance ("UI Division"). (Doc. 75-6, ¶ 9). AT&T has a contract with Equifax Workforce Solutions ("Equifax"), a third-party vendor, to administer unemployment claims filed by AT&T employees

in the United States. (Doc. 75-6, ¶ 5). Because Ray was still employed by AT&T, Equifax advised the UI Division that Ray was on a leave of absence and had not yet returned to work. *Id.* at ¶ 10; *id.* Ex. A.

On October 29, 2015, the UI Division determined that Ray was not entitled to unemployment benefits for the period of October 4, 2015 through October 17, 2015, because the "employment relationship has not been severed" and therefore Ray is "not unemployed." (Doc. 75-6, ¶ 11; *id.* Ex. B).

### E.  Workplace Misconduct

On June 27, 2015, an assistant manager overheard Ray ask a co-worker to access an account without the customer being present. (Doc. 75-2, ¶¶ 29, 31). The account belonged to either Ray's aunt or his grandmother's first cousin. (Doc. 75-2, Ex. B; Doc. 81-1, Pl.'s Dep. at 95–96). Once Ray accessed the account, he conducted a credit check, added a password, and then added unlimited data. (Doc. 75-2, ¶ 35). Ray also transferred the new line from the customer's account to his own, added unlimited data

to the new line activation, and classified the new line to trigger a senior discount. *Id.* at ¶ 36. All of this was done without the customer present and was captured on video cameras in the store (including in the inventory room) and from screen display images of the customer's account. *Id.* at ¶ 37. That same day, the assistant manager reported to the sales manager, Fred Hoskins, that Ray was absent from the sales floor. (Doc. 75-2, ¶ 30; *id.* Ex. A at 2).

After speaking with Ray regarding the customer's account he had accessed, on July 2, 2015, Hoskins referred the incident to the Regional Performance manager for investigation. (Doc. 75-2, ¶ 31). The report from the investigation noted that Ray's conduct constituted misconduct. *Id.* Ex. A at 2). Ray's conduct was considered a breach of AT&T's policies, and according to AT&T, is a violation of federal laws governing customer proprietary network information ("CPNI"), *see, e.g.*, 47 U.S.C. § 222, which could result in AT&T being fined by the Federal Communications Commission ("FCC"). (Doc. 75-2, ¶¶ 38-40).

Every day the case investigation was scheduled, however, Ray "called out" and this had occurred "several times." *Id.*; *id.* Ex. A at 2.

Because Ray's conduct on June 27 involved multiple CPNI breaches, the matter was referred to AT&T's Asset Protection department in September 2015. (Doc. 75-2, ¶ 42; *id.* Ex. B). If Asset Protection had been able to confirm that Ray accessed a customer's account and made changes without the customer being present, Ray would have been terminated for violating AT&T's code of conduct. *Id.* at ¶ 44. But because Ray never returned to work in order for Asset Protection to interview him, the case was closed subject to being reopened. (Doc. 75-2, ¶ 43). Ray's last full day at the store was August 30, 2015. *Id.* at ¶ 48. September 20, 2015 was Ray's last day at work but he was there for less than a minute. *Id.* at ¶ 49.

## F. Employment Termination

Having exhausted his FMLA leave and his ADL, Ray had the option to apply for a job accommodation through the

Integrated Disability Service Center ("IDSC") to cover his absences from October 27, 2015 through the date of his job abandonment on December 28, 2015. (Doc. 75-2, ¶ 50).[1] Ray knew how to make such a request because he had done so on two previous occasions. *Id.* at ¶ 52. This time, however, Ray never applied for a job accommodation. *Id.* at ¶¶ 53–56.

By December 2015, Ray had long exhausted his FMLA leave, taken an ADL, been denied short-term disability benefits, been denied unemployment benefits, and he did not have any application pending that would excuse his absences from work. Nor did he have approval from Hoskins to be absent after October 27, 2015. (Doc. 75-2, ¶¶ 56–57).

Thus, on December 10, 2015, Hoskins (on behalf of Waymire) sent Ray a Return to Work Letter. *Id.* at ¶ 57. In the letter, Ray was advised: "**You have not reported to work . . . and have been on unexcused absence . . . .**

---

[1] The IDSC is a third-party vendor that manages the disability benefits program and job accommodation process for AT&T. (Doc. 75-2, ¶ 51).

**In order to remain employed by [AT&T], you are required to return to work on or before 12/15/2015."** *Id.* Ex. C. at 1 (emphasis added). The letter instructed that if Ray "believe[d]" that he was "***unable to return to work*** by 12/15/2015," he had to choose one or more of the options listed below and "contact your supervisor before the return date" with your decision:

- "Contact Amy Waymire . . . and discuss what, if any, options may be available to you . . .";

- "Contact the IDSC . . . to provide additional documentation to support your denied [STD] claim, to submit a formal appeal . . ." or

- "Contact the IDSC . . . regarding your request for reasonable accommodations which will facilitate your return to work . . ."

(Doc. 75-2, Ex. C at 2) (emphasis in original). Significantly, the letter also provides that "**If *you* choose to try to extend your time** off through a request made to the IDSC, you must immediately contact your supervisor and notify him/her of your selected option and the date your claim/request was made to the IDSC." *Id.* (emphasis in original).

The record reveals that after the Return to Work

Letter, dated December 10, 2015, Ray did not make contact with Hoskins. The only contact Ray had with Waymire was two text messages, one on December 18 and the other on December 24, (Doc. 77-24 at 1), and a phone call on December 23, 2015. (Doc. 75-9, Pl.'s Suppl. Resp. to Interrog. at 7).

On December 18, Ray wrote to Waymire: "[J]ust wanted to let you know I tried returning your call regarding the letter I received from you. I only got it today, 12/18/2015, as UPS left it without a signature and I did not know I had received it." (Doc. 77-24 at 1). Then, in the phone call on December 23, Waymire informed Ray that he would need to have a short-term disability claim "showing as approved instead of as denied by December 26, 2015," or Ray would be terminated from his position. (Doc. 75-9, Pl.'s Suppl. Resp. to Interrog. at 7). The next day, December 24, Ray sent a long message to Waymire, explaining that he had not received the letter denying his STD benefits and that he was still trying to obtain the information from his doctor but was having difficulty

due to the holidays. (Doc. 77-24 at 1). Ray then asked, "Is there someone I can reach out to to [sic] explain the situation just because they're going to need more time on their end and I've done everything possible on my end already?" *Id.*

Ray knew the medical information was over a month past due when he was notified on November 24, 2015 in a letter that his STD benefits claim was denied for that reason. (Doc. 75-7, Ex. 65). That letter was sent via "UPS Next Day Air . . . and Regular U.S. Mail," so a signature was not required. (Doc. 75-7, Ex. 65). Thus, there was no longer a pending STD benefits claim. When Waymire responded on December 30, 2015 to Ray's text message, her answer was effectively just that. She stated, "No. At this point it would have been your responsibility to continue to follow up with them to ensure everything was handled on [sic] timely manner." *Id.*

On December 22, 2015, Ray was issued a Final Written Warning for an "unsatisfactory" attendance record because

he had incurred seven (7) or more unexcused "absence points." (Doc. 77-43). In fact, Ray had incurred a total of sixteen (16) absence points. *Id.* It is undisputed that Ray was absent in 2015 on July 12, July 13, July 15, July 18, and he received one point for each of these absences, even though Ray was approved for FMLA leave on each of these dates. *Compare* (Doc. 77-43), *with*, (Doc. 75-4, ¶ 31). Nonetheless, even without these additional points, Ray had still accumulated twelve unprotected "absence points."

Shortly thereafter, on December 30, 2015, Hoskins sent Ray another letter that referenced the Return to Work letter and notified him that "AT&T considers you to have voluntarily resigned your job," effective December 28, 2015. (Doc. 75-2, Ex. D). The letter stated: "**You have not reported to work, have not contacted the Company regarding your absence and have been on unexcused absence since 10/28/2015**." *Id.;* (Doc. 75-2, ¶ 59). That reasoning coincides with AT&T's Attendance Policy, which Ray was made aware of during his initial training. (Doc. 75-7,

Pl.'s Dep. at 217). Pursuant to that policy "[i]f an employee is absent from work for three (3) or more consecutive workdays without proper notification **or without Company approval**, the employee will be considered to have abandoned his/her job and voluntarily quit without notice." (Doc. 77-40) (emphasis added).

Ray was then issued a Termination Document, which stated, in part:

> According to our records, you have not reported to work and are no longer approved for disability benefits or a company approved leave of absence as of 10/28/2015. We also have no record of you taking the appropriate measures to apply for a possible accommodation under the Americans with Disabilities Act. **Your time away from work has been unexcused since 10/28/2015** and we sent a letter to your *[sic]* requiring you to return to work on 12/10/2015.

(Doc. 77-42) (emphasis added).

## G. Second Application for Unemployment Benefits

After being terminated, Ray again applied for unemployment benefits with an effective date of February 4, 2016. (Doc. 75-6, ¶ 12). On February 19, 2016, Equifax sent a letter to Kentucky's UI Division, in response to a questionnaire and "Notice to Employer of Claim for

Unemployment Insurance Benefits" Equifax had received from the UI Division. (Doc. 75-6, ¶ 13; Doc. 77-4). In the letter, Equifax opposed Ray's eligibility and erroneously stated that "[t]he claimant is currently on an approved leave of absence." (Doc. 77-4). AT&T's liaison to Equifax stated that the response was "inadvertently submitted." (Doc. 75-6, ¶ 14).[2] Indeed, the February 19 statement matches word-for-word the statement Equifax previously provided on November 18, 2015, regarding Ray's first application for unemployment benefits. (Doc. 75-6, Ex. A).

That same day, Equifax immediately sent a corrected response. (Doc. 75-6, ¶ 15; *id.* Ex. D). Equifax advised the UI Division that Ray "was discharged due to excessive absenteeism and tardiness" in violation of the "company policy," and mentioned that Ray had failed to "show up for work" after a letter was sent ordering him to do so.

---

[2] Equifax evidently was under the impression that this was the same claim, stating "Our records indicate this was previously adjudicated in the employer's favor." (Doc. 77-4).

*Id.* Ex. D. Neither Equifax nor Waymire provided any testimony or additional evidence to the UI Division after the February 19 corrected response to the questionnaire. (Doc. 75-6, ¶ 19).

On February 26, 2016, Ray's application for unemployment benefits was denied because the UI Division "found the discharge was for misconduct." *Id.* Ex. E. Ray appealed on March 11, and a hearing was held before a Referee on March 28, 2016. *Id.* Neither AT&T nor anyone on its behalf appeared at the hearing. *Id.* The Referee ultimately reversed the UI Division's decision. *Id.*

## H. Short-Term Disability Appeal

On April 6, 2016, over four months after his employment was terminated, Ray appealed the denial of his short-term disability benefits that was issued on November 24, 2015. (Doc. 75-2, ¶ 60; Doc. 75-7, Ex. 65). On August 16, 2016, Ray was approved for short-term disability benefits from November 4, 2015 through December 28, 2015. (Doc. 75-2, ¶ 61); (Doc. 77-48).

On March 23, 2017, Ray filed this lawsuit in state

court against AT&T and Waymire. (Doc. 1-2). Defendants then removed the action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. (Doc. 1).

Ray asserts the following eight counts: (1) FMLA interference under 29 U.S.C. § 2615(a)(1); (2) FMLA retaliation pursuant to 29 U.S.C. § 2615(a)(2); (3) Wrongful use of administrative proceedings; (4) Intentional infliction of emotional distress; (5) Negligent infliction of emotional distress; (6) Negligence or vicarious liability; (7) Punitive damages; and (8) Causation and damages.

## *Analysis*

## I. Defendants' Motion in Limine to Exclude Plaintiff's Expert, Scott R. Bauries

Before turning to the merits of Ray's claims, the Court must first determine whether Dr. Bauries' testimony would be admissible in evidence and thus may be considered on summary judgment. Federal Rule of Evidence 702 instructs that an expert "qualified" as possessing the requisite "knowledge, skill, experience, training, or education" may testify in the form of an opinion if

the proponent establishes that:

(a) the expert's . . . **specialized knowledge will help** the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony may "embrace[] an ultimate issue." Fed R. Evid. 704(a). But an expert "may not testify to a legal conclusion" or "define legal terms." *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014).

The Court concludes that Dr. Bauries' testimony must be excluded for two reasons: (a) it would not be helpful to the jury; and (b) it impermissibly offers legal conclusions.

First, Dr. Bauries begins by offering an analysis of how Ray's FMLA leave time should be calculated and what the employer notice requirements are. (Doc. 63-2 at 2-3, 4-6). This is inappropriate because FMLA regulations

explicitly establish "employer notice requirements," 29 C.F.R. § 825.300, and the rules and processes for the "calculation of leave." 29 C.F.R. § 825.205(b).

"A matter requiring statutory [or regulatory] interpretation is a question of law" for the Court to decide and then instruct the jury accordingly. *See, e.g.*, *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011); *Gibson v. City of Louisville*, 336 F.3d 511, 512-13 (6th Cir. 2003) (FMLA claim). As such, "[e]xpert testimony is not admissible to inform the trier of fact as to the law that it will be instructed to apply to the facts in deciding the case." 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 702.03(3) (Mark S. Brodin & Matthew Bender eds., 2d ed. 2019) [hereinafter "WEINSTEIN'S EVIDENCE"]. Therefore, Dr. Bauries' interpretation of the FMLA and its implementing regulations is not admissible. *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592-93 (6th Cir. 2014) This is especially true where, as explained below, Dr. Bauries interpretation of FMLA statutes and regulations is flawed.

Next, Dr. Bauries states in his report that he reviewed each of Ray's pay stubs over the 12 months prior to his initial FMLA leave on March 8, 2015, and "calculated the average weekly work/leave hours" by adding together the hours Ray worked (including any hours for which Ray took leave of any type), dividing that total by 52 weeks find the average hours worked each week, and then multiplying that average work week by 12 to arrive at the opinion that Ray was entitled to 389.64 hours of FMLA leave. (Doc. 63-2 at 2-3).

Dr. Bauries' computation involves basic math and thus violates the principle that an expert's testimony must involve "specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). It is well established that "expert testimony does not help where the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, *or simple logic*." 29 CHARLES ALLAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE §

6265.2 (2d ed., West 2018 update) (emphasis added) [hereinafter "WRIGHT"]; *see also* 4 WEINSTEIN'S EVIDENCE, §702.03(2)(a) ("Expert testimony is generally not permitted concerning factual issues that are within the knowledge and experience of ordinary lay people"). In other words, if "the subject matter is not complex or technical" expert testimony is not necessary. *Stromback v. New Line Cinema*, 384 F.3d 283, 295 (6th Cir. 2004). *See also Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 905 (6th Cir. 2006).

The lay jury is endowed with the common knowledge necessary to add, divide, and multiply the figures presented by the parties without "expert" testimony. Any perceived difficulty in submitting the relevant documents can easily be handled by stipulation of the parties, or alternatively, Rule 1006 expressly permits a party to "use a summary, chart, or *calculation* to prove the content of voluminous writings." Fed. R. Evid. 1006.

Even if Dr. Bauries' calculation was helpful, his testimony cannot be considered because his formula is

contrary to *FMLA statutes and regulations*. *See infra* Part II.A(1).[3]

Finally, Dr. Bauries' report is filled with a litany of legal conclusions that violate Rule 704. (Doc. 63-2 at 3–7). Dr. Bauries opines: (1) "That would constitute

---

[3] Ray's reliance on *Banks v. Bosch Rexroth Corp.*, No. 5: 12–345–DCR, 2014 WL 1364763, at *7 (E.D. Ky. Apr. 7, 2014) does not change the impropriety of Dr. Bauries' report. In *Banks*, Dr. Bauries offered legal analysis of the FMLA, a calculation of plaintiff's FMLA leave time, and legal conclusions that defendant violated the FMLA. *Id.* at *1, *5–7. The court concluded that "[w]hile the calculation of leave time will be allowed, Bauries' opinions regarding failure of notice and violations of the FMLA will be excluded" because "those matters speak[] to liability in this matter by stating that [defendant] breached the FMLA" which goes "to the ultimate question of liability" and is "not admissible under Rule 704." *Id.* at *7. The mathematical calculation was admitted only because defendants admitted they had poor record keeping practices and "difficulty in calculating [plaintiff's] leave time." *Id.* at *5–6. That is not the case here. AT&T's Director over FMLA operations has provided concise and organized records of Ray's FMLA leave and reported in summary fashion in her sworn affidavit the leave taken on each day. (Doc. 75-4, ¶¶ 25–31). But it bears emphasis that the *Banks* court nevertheless granted summary judgment in favor of defendant because "regardless of how the calculations are made, there was no violation of the FMLA." *Banks*, 15 F. Supp. 3d 681, 697–98 (E.D. Ky. 2014). The Sixth Circuit affirmed. 610 F. App'x 519, 525–26 (6th Cir. 2015).

a violation of the FMLA for failure to grant [Ray] the total leave requirement," *id.* at 3; (2) "the [alleged] reduction [in FMLA leave time] was in retaliation for [Ray]'s exercise of his FMLA rights," *id.* at 4; (3) "This constitutes a violation of the FMLA notice provisions, and therefore an interference with FMLA rights," *id.* at 5; (4) "the failure to timely notify itself constitutes interference with FMLA rights," *id.* at 5; (5) "Providing employees misleading information about their entitlement to leave . . . certainly fits with this [FMLA interference] definition," *id.* at 6; (6) AT&T's "failure to inform [Ray]" of certain information "was an interference with [Ray]'s FMLA rights." *Id.* at 6–7.

These are textbook attempts to offer legal conclusions. When Rule 704 "speak[s] of an expert's testimony embracing the ultimate issue, the reference must be to stating *opinions that suggest the answer* to the ultimate issue or that give the jury all the information from *which it can draw inferences as to the ultimate issue*." *DeMerrell v. City of Cheboygan*, 206 F.

App'x 418, 426 (6th Cir. 2006) (quoting *Berry*, 25 F.3d at 1353). Dr. Bauries' "report goes beyond this point (many times over)," and therefore the Court should "strike his entire report." *Summerland v. Cty. of Livingston*, 240 F. App'x 70, 81 (6th Cir. 2007); *Killion*, 761 F.3d at 593; *see also Greene v. Drobocky*, No. 1:12-CV-00078-TBR, 2014 WL 3955288, at *3 (W.D. Ky. Aug. 13, 2014) (excluding Dr. Bauries' opinion because the opinions were legal conclusions regarding whether Defendants actions violated ERISA).

Accordingly, the Court will exclude Dr. Bauries' report and testimony.

## II. Motion for Summary Judgment

### A.   FMLA Claims (Counts I & II)

The Sixth Circuit "recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555-56 (6th Cir.

2006) (quoting *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir.2004)). Ray alleges a claim under both theories. For the reasons that follow, summary judgment is appropriate on each of Ray's FMLA claims.

### 1. (Count I) – FMLA Interference Claim Under § 2615(a)(1)

To prevail on an interference claim or "entitlement" claim, Ray must prove that:

> (1) he was an eligible employee; (2) Defendant was an employer subject to the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave his employer notice of his intention to take FMLA leave; and (5) Defendant denied him FMLA benefits to which he was entitled.

*Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 840 (6th Cir. 2012). *See also Vonderhaar v. Waymire*, No. 19-5332, 2020 WL 238280, at *7 (6th Cir. Jan. 15, 2020). Here, because AT&T only challenges the last element, the question is whether Ray was denied FMLA benefits to which he was entitled. (Doc. 75-1 at 17). "This inquiry is an objective one divorced from the employer's motives, with the central question being simply whether the employee was entitled to the FMLA benefits at issue." *Coker v.*

*McFaul*, 247 F. App'x 609, 617 (6th Cir. 2007) (quoting *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 511 (6th Cir. 2006)).

### a. Ray was not Denied FMLA Benefits

As relevant here, an "eligible employee" is "entitled to a total of 12 workweeks of leave during any 12-month period" for "a serious health condition" that renders the employee unable to perform an essential function of their job. 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 200(a)(3).[4] Pursuant to 29 C.F.R. § 825.200(b), an employer may choose one of four methods for determining the "12-month period" in which an employee's 12 weeks of FMLA leave

---

[4] There is an additional benefit under the FMLA: "Qualifying employees who return to work within that 12-week period are entitled to be reinstated to their previous position. *Edgar v. JAC Prods.*, 443 F.3d 501, 506 (6th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)). Although Ray claims he was denied reinstatement, (Doc. 1-2, ¶¶ 20, 29), it is undisputed that Ray never returned to work after exhausting his FMLA leave on October 4, 2015, and AT&T waited until December 28, 2015 before terminating Ray's employment. (Doc. 75-4, ¶ 32; Doc. 75-2, ¶¶ 49, 59). "[T]he FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends." *Edgar*, 443 F.3d at 506 (citation omitted). Ray therefore had no right to reinstatement.

entitlement occurs.[5] The method chosen must be applied to all employees. 29 C.F.R. § 825.200(d)(1). "If an employer fails to select one of the options . . . for measuring the 12-month period, the option that provides the most beneficial outcome for the employee will be used." 29 C.F.R. § 825.200(e). Here, AT&T measures the 12-month period based on the calendar year. (Doc. 77-5 at 1).

An employee's "12 workweeks of leave" entitlement is then calculated according to the standards prescribed in 29 C.F.R. § 825.205(b). *See Mendel v. City of Gibraltar*,

---

[5] 29 C.F.R. § 825.200(b) provides that an employer may choose any one of the following four methods for determining the "12-month period":

(1) The calendar year;

(2) Any fixed 12-month leave year, such as a fiscal year, a year required by State law, or a year starting on an employee's anniversary date;

(3) The 12-month period measured forward from the date any employee's first FMLA leave under paragraph (a) begins; or,

(4) A "rolling" 12-month period measured backward from the date an employee uses any FMLA leave as described in paragraph (a).

607 F. App'x. 461, 464–66 (6th Cir. 2015). The parties dispute whether subsection (b)(2) or (b)(3) provides the applicable formula. (Doc. 77 at 25; Doc. 81 at 8).

Subsection (b)(2) provides that "[i]f an employer has made a permanent or long-term change in the employee's schedule (for reasons other than FMLA, and prior to the notice of need for FMLA leave), the hours worked under the new schedule are to be used for making this calculation." 29 C.F.R. § 825.205(b)(2) (emphasis added). In contrast, under subsection (b)(3), "[i]f an employee's schedule varies from week to week to such an extent that an employer is unable to determine with any certainty how many hours the employee would otherwise have worked (but for the taking of FMLA leave), a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (including any hours for which the employee took leave of any type) would be used for calculating the employee's leave entitlement." *Id.* § 825.205(b)(3).

Subsection (b)(3) does not apply here. It is

undisputed that Ray was a part-time employee working a "permanent" number of hours each week. (Doc. 75-4, ¶¶ 29; Doc. 75-2, ¶ 17); (Doc. 75-9 at 4; Doc. 75-7 at 83). There is no evidence that AT&T was "unable to determine with any certainty" how many hours Ray worked.

On the other hand, subsection (b)(2) does apply. The record establishes that Ray worked a "permanent" schedule of 32 hours per week through May 2015, at which time AT&T "made a permanent . . . change in [Ray]'s schedule," setting Ray's permanent schedule at 27.25 hours per week. (Doc. 75-4, ¶ 29). Therefore, "the hours worked under the new schedule are to be used" for purposes of calculating an employee's FMLA entitlement. 29 C.F.R. § 825.205(b)(2).

As such, the undisputed facts establish that Ray was not denied FMLA benefits to which he was entitled. The record shows that Ray's initial permanent work schedule was 32 hours per week, thereby entitling Ray to 384 hours of FMLA leave. (Villarreal Decl. ¶ 25) (Doc. 75-4). Ray exhausted 125 hours of intermittent FMLA leave, or

3.90625 weeks of his 12-workweek entitlement, between March 8 and May 23, 2015. Ray was left with 8.0937 weeks of leave at the end of May 2015.[6] At that time, Ray's permanent schedule changed to 27.25 hours per week. (Doc. 75-4, ¶¶ 25-29). That was done automatically by AT&T's People Tool based on the needs of the store and did not result in a pending request for FLMA leave being denied. (Doc. 75-2, ¶¶ 12, 17). This is permissible because it was "for reasons other than FMLA, and prior to the notice of need for FMLA leave." 29 C.F.R. § 825.205(b)(2). Moreover, Ray has produced no evidence to show that he was not in fact scheduled for 27.25 hours per week after May 2015.

Villarreal's subsequent calculations are slightly off, but the difference has no impact on Ray's interference claim. The weekly number of hours Ray was scheduled (27.25) multiplied by the number of weeks of FMLA leave Ray had remaining (8.0937) yields exactly 220.554688 hours of FMLA leave that Ray had remaining for

---

[6] AT&T rounded this number to 8.09. (Doc. 75-4, ¶ 28).

the calendar year at the end of May 2015. Ray then was approved for and took intermittent FMLA leave on various dates from June 6, 2015 through October 4, 2015. (Doc. 75-4, ¶ 31(r)-(zz)). During this period, Ray used a total of 237.72 hours of FMLA, all of which AT&T approved.[7] Contrary to AT&T's argument, however, the 16-day ADL Ray was granted is not FMLA leave and thus cannot be counted as such. (Doc. 75-1 at 17, 19; Doc. 81 at 8). Nonetheless, Ray was approved for precisely 17.1653125 hours above and beyond that to which he was entitled to under the FMLA.

The same result obtains even if the Court accepts Dr. Bauries' opinion that AT&T could not reduce Ray's workweek schedule and that Ray was entitled to 389.64 hours of leave. (Doc. 63-2 at 3). It is undisputed that Ray had a total of 367.72 hours coded as FMLA leave. (Doc. 75-4, ¶ 31). Notably, Ray never requested

_____

[7] With respect to Ray's request for 1.78 hours of FMLA leave on October 5, 2015, this was not approved as FMLA time and therefore did not count against his entitlement. (Doc. 75-4, ¶ 32; id. Ex. D at 2). Thus, the total FMLA leave time applied toward Ray's entitlement is 237.72, not 239.5 as Villareal calculated. (Doc. 75-4, ¶ 30).

additional FMLA hours after being informed that he had exhausted his entitlement. *Levaine v. Tower Auto. Operations USA I, LLC*, 680 F. App'x 390, 393 (6th Cir. 2017) ("To be entitled to FMLA leave, an employee must both notify his employer of his need to take leave and state a qualifying reason for leave.").

Nevertheless, after the ADL that AT&T granted Ray had expired on October 26, 205 (Doc. 75-2, ¶ 24), Ray was effectively terminated on December 28, 2015 and his "time away from work ha[d] been unexcused since 10/28/2015"—a total of eight (8) weeks. (Doc. 77-4). Using Ray's initial permanent work schedule, Ray would have taken an additional 256 hours (32 hours x 8 weeks) during this period. "Acceptance of [Ray]'s argument that [21.92] hours of [his] leave were not properly coded as FMLA leave results in two possible scenarios: either the leave was FMLA leave and [Ray] exhausted [his] allotment [albeit a few days later], or the leave was unexcused, and [AT&T] was entitled to terminate [Ray] for taking it" as AT&T did. *Banks v. Bosch Rexroth Corp.*, 610 F. App'x

519, 526 (6th Cir. 2015). In either case, as in *Banks*, Ray exhausted his FMLA leave.

"Once an employee exceeds his twelve work weeks (or sixty workdays) of FMLA leave, additional leave in the twelve month period is not protected by the FMLA, and termination of the employee will not violate the FMLA." *Coker v. McFaul*, 247 F. App'x 609, 620 (6th Cir. 2007) (citation omitted). Summary judgment is therefore appropriate on Ray's FMLA interference claim because AT&T granted all the FMLA leave to which he was entitled. *Travers v. Cellco P'ship*, 579 F. App'x 409, 414 (6th Cir. 2014); *Banks*, 610 F. App'x at 526.

### b. Ray Has not Shown "Prejudice"

Despite receiving all the FMLA leave to which he is entitled, Ray maintains that FMLA interference occurred in several other ways.

First, Ray argues that AT&T interfered with or discouraged him from exercising his FMLA rights by maintaining "confusing" and "conflicting policies and procedures in order to obtain FMLA leave." Ray cites to

*Harcourt v. Cincinnati Bell Tel. Co.*, 383 F. Supp. 2d 944 (S.D. Ohio 2005). (Doc. 77 at 24–25). In *Harcourt*, however, the defendant's FMLA policies for medical certification contravened federal regulations. 383 F. Supp. 2d at 953–61. *Harcourt* says nothing about "confusing and frustrating" policies being actionable under the FMLA. (Doc. 77 at 24–25).

Moreover, Ray's argument is belied by the record. The three-step process for obtaining FMLA leave at AT&T was rather simple and was posted on the company's employee intranet site. Ray clearly knew how to use the site because he requested and was approved for a total of 367.72 hours of FMLA leave over an intermittent span of 52 days. (Doc. 75-4, ¶ 31). Each time Ray was approved for leave, a notice informed Ray that he could "monitor [his] FMLA requests on the FMLA Status Site from work . . . or from home" at one of the two website addresses provided. (Doc. 75-4, Ex. C). And Ray admits that he could go online and view his FMLA usage. (Doc. 801-1 at 278). It is disingenuous for Ray to now argue that he

could not understand AT&T's policies.

Next, Ray contends that AT&T failed to notify him of his leave entitlement, in violation of the requirements governing the notices an employer must provide under 29 C.F.R. § 300(b)(3), (c), and (d)(1) & (4). (Doc. 77 at 25). The plain language of these regulations and the record evidence, however, refute Ray's position.[8] Nothing requires an employer to provide a notice with a running total of the FMLA leave an employee has remaining each time a qualifying leave of absence is taken. But even if AT&T did fail to provide a required notice (and nothing suggests that is the case) Ray's claim still must fail

---

[8] For example, AT&T provided Ray with notice when he was eligible for FMLA and when he exhausted his FMLA leave, (Doc. 75-4, ¶¶ 26, 32; *id.* Ex. B, D), thereby satisfying the mandate in 29 C.F.R. § 300(b)(3) to notify Ray of a change in his eligibility status *if* "[Ray]'s eligibility status has changed." So long as Ray's eligibility status remained the same, "no additional eligibility notice [was] required." 29 C.F.R. § 300(b)(3). And "[o]nly one notice of designation is required for each FMLA-qualifying reason per applicable 12-month period, regardless of whether the leave taken due to the qualifying reason will be a continuous block of leave or intermittent or reduced schedule leave." 29 C.F.R. § 825.300(d)(1). At any rate, it is unclear what particular notice Ray claims he did not receive.

because he has not shown that he was prejudiced as a result.

Even where an employee proves that his employer violated 29 U.S.C. § 2615, the cause of action set out in "§ 2617 provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89 (2002); *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 726 (6th Cir. 2003). This is because an "employer is liable only for compensation and benefits lost 'by reason of the violation,' [29 U.S.C.] § 2617(a)(1)(A)(i)(I), for other monetary losses sustained 'as a direct result of the violation,' [*id.*] § 2617(a)(1)(A)(i)(II), and for 'appropriate' equitable relief, including employment, reinstatement, and promotion, [*id.*] § 2617(a)(1)(B)." *Ragsdale*, 535 U.S. at 89-91; *see also Wilkerson v. AutoZone, Inc.*, 152 F. App'x 444, 449 (6th Cir. 2005); *Coker v. McFaul,* 247 F. App'x 609, 619 (6th Cir. 2007).

In other words, "the FMLA is not a strict-liability statute." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507

(6th Cir. 2006). "A plaintiff seeking relief under the interference or entitlement theory must show that the violation caused him harm." *Harris v. Metro. Gov't of Nashville and Davidson Cty.*, 594 F.3d 476, 484 (6th Cir. 2010). It is not enough that a defendant "technically violated [an] FMLA regulation," *Verkade v. United States Postal Serv.*, 378 Fed. Appx. 567, 575 (6th Cir. 2010), where it has been shown that the employee has received all of the "substantive benefits" to which they are entitled under the FMLA. *See, e.g.*, *Banks*, 610 F. App'x at 524–26.

Here, Ray received all 12 weeks of FMLA leave. Ray has not suffered any harm from AT&T's alleged failure to provide him with a particular notice. *Coker*, 247 F. App'x at 617–20; *Verkade*, 378 F. App'x at 575.

Moreover, the four "absence points" Ray received in 2015 for the FMLA-approved dates of July 12, July 13, July 15, July 18 did not result in Ray being prejudiced or otherwise demoted, terminated, or discouraged from taking leave. *Compare* (Doc. 77-43), *with*, (Doc. 75-4, ¶

31).[9] Indeed, after these dates Ray continued to request and was approved for all of the leave to which he was entitled.

The case Ray relies upon, *Sabbrese v. Lowe's Home Ctrs., Inc.*, 320 F. Supp. 2d 311 (W.D. Pa. 2004), is inapposite. There, the plaintiff was a diabetic and unexpectedly left his department unattended because he needed to eat. *Id.* at 314–15. Plaintiff received a verbal warning and was terminated less than two weeks later. *Id.* 315–17, 326. In contrast to *Sabbresse*, Ray received all of the FMLA leave to which he was entitled. That is all that is needed to dispose of Ray's interference claim. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012).

Notwithstanding, any argument that the four

---

[9] Contrary to Ray's statement of the dates he was disciplined, (Doc. 77 at 23), the Final Written Warning does not indicate that Ray was assessed absence points for March 8–9, and Ray's FMLA request for leave on October 5 was not approved because the last of his leave had been exhausted by virtue of his request that his absence on October 4 be covered as FMLA leave. (Doc. 77-43); (Doc. 75-4, ¶ 32).

disciplinary points he received formed part of the basis for his termination, or any other reason Ray advances, is more appropriately addressed under the retaliation theory. Indeed, where the plaintiff purports to advance both interference and retaliation claims but "received all of the FMLA leave to which he was entitled," as in this case, a court may analyze the assertions under the retaliation theory. *See, e.g.*, *Seeger*, 681 F.3d at 283; *Wallner v. J.J.B. Hilliard, W.L. Lyons LLC*, 590 Fed. Appx. 546, 551–52 (6th Cir. 2014).

Accordingly, Count I must be dismissed with prejudice.

### 2. (Count II) – FMLA Retaliation Claim Under § 2615(a)(2)

Where, as here, "a plaintiff attempts to establish an FMLA retaliation claim based on circumstantial evidence, the *McDonnell Douglas* framework governs." *Cooley v. E. Tenn. Human Res. Agency, Inc.*, 720 F. App'x 734, 742 (6th Cir. 2017). Under that framework, Ray has the burden first to establish a prima facie case of discrimination by showing that:

> (1) he was engaged in a statutorily protected
> activity; (2) [AT&T] knew that he was exercising
> his FMLA rights; (3) he suffered an adverse
> employment action; and (4) a causal connection
> existed between the protected FMLA activity and
> the adverse employment action.

*Seeger*, 681 F.3d at 283.

The first two elements are uncontested. If Ray establishes the last two elements, "the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse action." *Cooley*, 720 F. App'x at 742. "If the employer offers such a reason, the burden shifts back to the employee to show that the articulated reason is a pretext to mask discrimination." *Id*. "In contrast to the interference theory, '[t]he employer's motive is relevant because [FMLA] retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights.'" *Seeger*, 681 F.3d at 282 (quoting *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006)).

Ray argues the following actions by AT&T are cognizable as retaliation under the FMLA: (1) denying him a transfer to another store; (2) denying him

reinstatement once his short-term disability leave was approved (Doc. 77 at 28–29); and (3) assessing him "absence points" for the FMLA dates he was absent in July and then terminating him in December 2015. *See id.* at 19, 24, 27; (Doc. 1-2, ¶ 29).[10]

Ray's first basis fails because "a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes." *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007).[11]

---

[10] To the extent it can gleaned from the Complaint that AT&T reduced Ray's scheduled hours because he had previously taken such leave, thereby reducing his FMLA leave, Ray has not developed this argument at summary judgment. At any rate, the schedule change was done automatically by AT&T's People Tool based on the needs of the store. (Doc. 75-2, ¶¶ 12, 17). This is permissible so long as it was "for reasons other than FMLA, and prior to the notice of need for FMLA leave." 29 C.F.R. § 825.205(b)(2). When a company has an automatic system to reduce the number of hours of labor according to customer traffic that is undoubtedly a legitimate reason unrelated to an employee's exercise of their FMLA rights.

[11] The standard for determining an "adverse employment action" is the same "under Title VII retaliation and FMLA retaliation claims." *Crawford v. JP Morgan Chase &*

The second basis is also unavailing. Ray offers no authority to support the theory that he had a right to reinstatement after obtaining *short-term disability benefits*.[12] Moreover, Ray has no right to reinstatement under the FMLA because, as noted above, he never returned to work after exhausting his FMLA leave. *Edgar*, 443 F.3d at 506–07 ("[A]n employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave."); 29 C.F.R. § 825.216(a).

Here, Ray's health care provider, Dr. Michael Pugh, wrote to AT&T's IDSC on October 28, 2015 that Ray was "unable to work" through January 15, 2016 (Doc. 75-8, Ex. 3 at 12), and again on February 23, 2016 that "Ray was off work and under my care on Temporary Total Disability from October 28, 2015 through January 15, 2016 . . . and

---

*Co.*, 531 F. App'x 622, 627 (6th Cir. 2013).

[12] It bears emphasis that Ray was not approved for short-term disability benefits until August 16, 2016. (Doc. 75-2, ¶ 61; Doc. 77-48). By that time over seven months had passed since Ray was terminated. (Doc. 75-2, Ex. D).

suffering from acute pain which severely limited his ability to perform activities of daily living." *Id.* at 30; (Doc. 75-8, Pugh Dep. at 69–70). "[E]mployees who remain 'unable to perform an essential function of the position because of a physical or mental condition . . . [have] no right to restoration to another position under the FMLA.'" *Edgar*, 443 F.3d at 506 (alteration in original) (quoting 29 C.F.R. § 825.216(c)).

That leaves the final aspect of AT&T's conduct. Ray alleges he was terminated "because he exercised his rights under the FMLA" or, in part, due to the four "absence points" he received in 2015 for FMLA-approved dates (July 12, July 13, July 15, July 18). The termination letter, dated December 30, 2015, states: "You have not reported to work, have not contacted the Company regarding your absence and have been on unexcused absence since 10/28/2015." (Doc. 75-2, Ex. D). The letter says nothing about discipline for excessive accumulation of absence points. As such, by itself, "discipline, whether warranted or not, do[es] not constitute a material

adverse change in the terms of employment . . ." *Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 494 (6th Cir. 2017).

Ray nevertheless maintains that the temporal proximity of his FMLA leave and his termination establish causation. (Doc. 77 at 28). Temporal proximity "between the protected activity and the adverse employment action" can suffice to establish causation for purposes of making out a prima facie case. *Seeger*, 681 F.3d at 283–84 (noting that a time period of two to three months is sufficient). But Sixth Circuit case law is inconsistent as to the relevant time frame. *Compare Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014) (noting that evidence of a causal connection was sufficient "where the time between the employee's leave expired . . . and the employee's termination was two to three months."), *with, Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) ("[T]he relevant timeframe for us to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the

adverse employment action is the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires." (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

Here, Ray first took FMLA leave in March 2015 (meaning a ten-month gap exists) but Ray exhausted his leave on October 4, 2015 (resulting in nearly a three-month gap). The Court will assume the evidence of temporal proximity is sufficient because Ray's claim nonetheless fails. *See Seeger*, 681 F.3d at 283 ("The burden of proof at the prima facie stage is minimal"); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001) ("A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one.").

Turning to whether AT&T's justification for terminating Ray was legitimate and nondiscriminatory, AT&T offers two reasons: (1) If Ray had returned to work and Asset Protection was able to confirm that he accessed a customer's account and made changes without the

customer being present, he would have been terminated for violation of the company Code of Business Conduct; and (2) Ray was terminated because he failed to return to work after a notice informed him to do so. (Doc. 75-2, ¶ 44; Doc. 77-37; Doc. 77-42; Doc. 75-1 at 25). The latter alone is a legitimate justification.

The sequence of events here is telling: Ray was last seen at work for less than a minute on September 20, 2015; he then exhausted his FMLA on October 4; AT&T granted him an ADL until October 26; AT&T issued a return to work notice on December 10, informing him that his absence had been unexcused since October 28, 2015 and he was to return to work by December 15; when that date passed, Waymire gave Ray until December 26 to show that he was approved for short-term disability in order to keep his job; and *then* Ray was ultimately terminated after an unexcused hiatus from work for over two months.[13] AT&T has thus carried its burden of showing a legitimate

---

[13] (Doc. 75-4, ¶ 32; Doc. 75-2, ¶ 24; Doc. 75-4, ¶ 32; Doc. 75-2, ¶¶ 49, 59; Doc. 75-9, Pl.'s Suppl. Resp. to Interrog. at 7).

reason for Ray's termination. Indeed, AT&T went above and beyond its clear job abandonment policy, under which an employee is considered to have "voluntarily quit" when they are "absent from work for three (3) or more consecutive days . . . without approval." (Doc. 77-40).

Ray thus must offer evidence of pretext. "A plaintiff may establish pretext by showing that the employer's proffered reason (1) has no basis in fact, (2) did not actually motivate the action, or (3) was insufficient to warrant the action." *Cooley*, 720 F. App'x at 743 (citing *Seeger*, 681 F.3d at 285).

Ray has failed to raise a triable issue under any of these options. His opposition brief on this issue is wholly conclusory, and a review of the record yields no evidence from which a reasonable jury could conclude that AT&T terminated Ray's employment due to his use of FMLA leave. Thus, Ray's retaliation claims rests entirely on temporal proximity. But "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757,

763 (6th Cir. 2012); *Skrjanc*, 272 F.3d at 317 ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.").

Count II therefore will be dismissed with prejudice.

## B. Wrongful Use of Administrative Proceedings (Count III)

Ray asserts a claim for "wrongful use of administrative proceedings" against AT&T. To state a claim for wrongful use of civil proceedings a plaintiff must establish the following elements:

(1) the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings,

(2) by, or at the instance, of the original plaintiff/complainant,

(3) the termination of such proceedings in the original defendant's favor,

(4) malice in the institution of such proceeding,

(5) want or lack of probable cause for the proceeding, and

(6) the suffering of damage as a result of the proceeding.

*Farmers Deposit Bank v. Ripato*, 760 S.W.2d 396, 399 (Ky. 1988) (quoting *Raine v. Drasin*, 621 S.W.2d 895, 389 (Ky. 1981)). Ray's claim fails to clear the first hurdle.

The basis for Ray's claim is that in a letter dated February 19, 2016, Equifax responded to the Kentucky UI Division's questionnaire and notice regarding Ray's claim for unemployment insurance benefits. In opposing Ray's eligibility, Equifax erroneously stated that Ray was "currently on an approved leave of absence." (Doc. 75-6, Ex. C). AT&T maintains that this was inadvertent. Indeed, that same day, Equifax corrected the error and stated that Ray had been "discharged due to excessive absenteeism and tardiness." *Id.* Ex. D. Ray's application for unemployment benefits was denied but Ray later prevailed on appeal. Ex. E. Neither AT&T nor anyone on its behalf appeared at the hearing. *Id.*

The claim fails because Equifax, or AT&T for that matter,[14] did not institute or continue any proceedings.

---

[14] Neither party addresses the problem that Equifax—not AT&T—responded to the UI Division's notice. Generally, a principal cannot be held liable for the torts

But even if Ray's claim is recharacterized as a claim for abuse of process, it still must fail. The Kentucky Supreme Court describes "an abuse of process claim as the improper use[] [of] a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which that process is not designed . . . ." *Garcia v. Whitaker*, 400 S.W.3d 270, 276 (Ky. 2013) (alterations in original) (citations omitted). "The tort is comprised of the following two necessary elements: (1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Id.* (citations and internal quotation marks omitted).

Here, Ray cannot establish the second element. First, nothing suggests this was willful especially given the fact that Equifax immediately corrected the information the same day. And second, responding to UI Division requests for information is not only proper but it is required under threat of criminal sanctions. *See* KRS §

---

committed by an independent contractor. *See* RESTATEMENT (SECOND) OF AGENCY §§ 219–220, 250 (AM. LAW INST. 1958) (West update March 2019); *id.* § 220 cmt. e.

341.990(5)-(6).

This leads to the final alternative framework for Ray's claim. KRS § 341.990 also states:

> Any person who knowingly makes a false statement or representation, or who knowingly fails to disclose a material fact to prevent or reduce the payment of benefits to any worker entitled thereto, or to avoid becoming or remaining subject to this chapter, or to avoid or reduce any payment required of an employing unit under this chapter shall be guilty of a Class A misdemeanor unless the liability avoided or attempted to be avoided is one hundred dollars ($100) or more, in which case he shall be guilty of a Class D felony.

KRS § 341.990(a)(6). Although this a criminal statute, in a case involving allegations that a plaintiff's employer "falsely told Kentucky authorities that he had quit," which led to his unemployment benefits being denied for some time before he was successful on appeal, the Kentucky Supreme Court recently held that such a claim is cognizable under KRS § 341.990(a)(6) and KRS 446.070 provides the necessary right of action. *Hickey v. GE Co.*, 539 S.W.3d 19, 20, 25 (Ky. 2018).

Again, however, Ray raises no triable issue. In contrast to the facts of *Hickey*, Equifax's initial

statement did not cause the denial of Ray's benefits. Nothing Equifax stated in the correction letter was false in any sense of the word. And yet the UI Division denied Ray unemployment benefits even though it possessed the corrected information.

Accordingly, the Court will dismiss Count III with prejudice.

## C. Intentional Infliction of Emotional Distress ("IIED") (Count IV) and Negligent Infliction of Emotional Distress (Count V)

For an IIED claim to be actionable, the conduct at issue must, *inter alia*, transcend "all reasonable bounds of decency" and be considered "utterly intolerable in a civilized community." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 796, 791 (Ky. 2004) (quoting *Craft v. Rice*, 671 S.W.2d 247, 250 (Ky. 1984)).[15]

---

[15] In particular, a plaintiff must establish the following four elements: (1) the defendant's conduct was "intentional or reckless"; (2) the conduct was "outrageous and intolerable" such that "it offends generally accepted standards of decency and morality"; (3) there is a "causal connection between the wrongdoer's conduct and the emotional distress"; and (4) the emotional distress caused was "severe." *Willgruber*, 920 S.W.2d at 65 (quoting *Craft*, 671 S.W.2d at 249).

The facts in this case do not approach this standard. "The mere termination of employment and the resulting embarrassment do not rise to the level of outrageous conduct and resulting severe emotional distress necessary to support a claim for IIED." *Miracle v. Bell Cty. Emergency Med. Servs.*, 237 S.W.3d 555, 560 (Ky. 2007); *see* also *Wells v. Huish Detergents, Inc.*, 19 F. App'x 168, 179 (6th Cir. 2001).

Ray's IIED claim and NIED claim also fail because each requires a showing of "serious" or "severe" emotional distress. *Crook v. Maguire*, No. 2015-CA-000379-MR, 2018 Ky. App. LEXIS 133, at *4 (Ky. Ct. App. May 11, 2018) (citing *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012)). "Distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice. And a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment." *Osborne*, 399 S.W.3d at 17 (citations omitted). Ray has produced no evidence to support this

claim. In fact, the anxiety for which he seeks compensation is the very same anxiety he has been experiencing since 2010 when he was employed by another company. (Doc. 81-1, Pl.'s Dep. at 37–39).

Count IV and Count V will therefore be dismissed with prejudice.

### D. Vicarious Liability/Negligence (Count VI), Punitive Damages (Count VII), and Causation and Damages (Count VIII) are Not Independent Causes of Action.

In Count VI, Ray asserts a claim for vicarious liability based on the negligence of Defendants' agents. But the doctrine of "*respondeat superior* is not a cause of action. It is a basis for holding the [Defendant] responsible for the acts of its agents." *O'Bryan v. Holy See*, 556 F.3d 361, 370 n.1, 383 (6th Cir. 2009). Therefore, Count VI must be dismissed.

Count VII sets forth a claim for punitive damages. Again, "a claim for punitive damages is not a separate cause of action, but a remedy potentially available for another cause of action." *PNC Bank, N.A. v. Merenbloom*, Nos. 15-6361, 16-5277, 2017 WL 3973962, at *3 (6th Cir.

June 16, 2017) (citation omitted) (applying Kentucky law); *see also Horton v. Union Light, Heat, & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985). In opposition, Ray cites to *Chelsey v. Abbott*, 524 S.W.3d 471 (Ky. Ct. App. 2017). But *Chelsey* is easily distinguishable because that case involved a specific Kentucky statute that "treat[ed] punitive damages as a 'claim.'" *Id.* at 481–82. Accordingly, Count VII will be dismissed.

Finally, causation is merely an element of a common law negligence claim. *Osborne*, 399 S.W.3d at 17.

Therefore, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that: (1) Defendants' motion in limine to exclude Scott R. Bauries (Doc. 74) be, and is hereby, **GRANTED;** (2) Defendants' motion for summary judgment, (Doc. 75) be, and is hereby, **GRANTED;** (3) Defendants' motion to strike one of Plaintiff's exhibits (Doc. 86) be, and is hereby, **DENIED AS MOOT;** (4) Defendant's motion to supplement Defendants' motion in limine (Doc. 85) be,

and is hereby, **GRANTED;** and (5) A separate judgment shall enter concurrently herewith.

This 3rd day of February 2020.



Signed By:

**_William O. Bertelsman_**

**United States District Judge**